EXPRESS ONE INTERNATIONAL,
INC., Plaintiff,

v.

UNITED STATES POSTAL
SERVICE, Defendant.

EMERY WORLDWIDE AIRLINES,
INC., Plaintiff,

v.

UNITED STATES POSTAL
SERVICE, Defendant.

Civ. A. Nos. 92–2207 (RCL),
92–2210 (RCL).

United States District Court,
District of Columbia.

Dec. 22, 1992.
Opinion Modifying Opinion and Judgment
Feb. 23, 1993.

Cheryl Joel Van Over, William James Mertens, Swidler & Berlin, Washington, DC, for plaintiff.

Marina Utgoff Braswell, U.S. Atty.'s Office, Washington, DC, for defendant.

John A. Ordway, Oppenheimer Wolff & Donnelly, Washington, DC, for intervenor Emery Worldwide Air.

Andrew B. Sacks, Galland, Kharasch, Morse & Garfinkle, Washington, DC, for intervenor Postal Air.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This case comes before the court on the four parties' motions for summary judgment. Upon consideration of the motions for summary judgment, the multiple oppositions filed by each party, and each parties' reply briefs, and for the reasons presented below, Emery and Express One's Motions for Summary Judgment are GRANTED to the extent they comport with this opinion. An appropriate order invalidating the September 16, 1992, ANET–93–01 contract and entering a permanent injunction against the United States Postal Service will issue this date.

## I. PROCEDURAL HISTORY.

Plaintiffs in these consolidated suits, Emery and Express One, are disappointed bidders for a ten-year, $1 billion contract (known as "ANET") with the United States Postal Service (USPS) to provide express mail and priority mail delivery for the Postal Service beginning January 20, 1993. The incumbent provider is Emery. Intervenor-defendant Postal Air, Inc., formerly known as Kitty Hawk Air Cargo, Inc., was awarded the new contract on September 16, 1992.

In its first encounter with this case, this court denied a motion by Emery for a temporary restraining order due to the lack of imminent harm. Then, on October 23, 1992, the court entered a preliminary injunction which prohibited the USPS from performing any work on the ANET contract. 814 F.Supp. 87. In the interest of resolving this case in an expedited fashion, the court also ordered expedited discovery (which was completed on November 25, 1992) and established an accelerated briefing schedule for the parties' motions for summary judgment.

It is to those four motions that the court now turns.

## II. FINDINGS OF FACT.[1]

The court finds that there is no genuine dispute concerning the following facts:

1. William G. Cole worked as an "as required" employee for A.D. Little, Inc., for all relevant periods herein. A.D. Little served the USPS as a consultant/evaluator on the ANET procurement.

2. Conrad ("Connie") Kalitta is the Chief Executive Officer and sole shareholder of American International Airways, Inc. ("AIA"). Through AIA, he is also one-half owner of Postal Air, Inc., the successful bidder on the ANET procurement.

3. Mr. Kalitta contacted Mr. Cole on May 26, 1992, and invited him to interview for a potential position as head of the maintenance operation for a Miami-based fleet of 747s Mr. Kalitta was in the process of obtaining. Mr. Cole told Mr. Kalitta that he was "very much" interested in that kind of position.

4. On May 26, 1992, Mr. Cole wrote the contracting officer on the ANET procurement, Rex M. Maytan, to inform him of this potential employment situation: "I wish you to be aware of the possibility of my being employed by Kalitta Airlines at some future date that may precede the above contract award dates." The letter evidenced Mr. Cole's knowledge that "Kalitta Airlines is a potential bidder for U.S. Postal Service contracts." Letter from William G. Cole to Rex M. Maytan of May 26, 1992.

5. On June 2, 1992, USPS Assistant General Counsel Michael J. Vandamm wrote a memo to Rex Maytan addressing Mr. Cole's conflict of interest. That memo clearly stated the USPS's contemporaneous position as to what would constitute a conflict of interest:

> We would regard Mr. Cole as having a conflict of interest if, while he is employed by, or while he is negotiating or discussing his prospective employment with Kiletta [sic], he is also a consultant for any procurement in which Kiletta [sic] is an actual *or prospective* contractor or subcontractor, or otherwise has a financial interest. Therefore, unless and until Mr. Cole *affirmatively rejects* Mr. Kiletta's [sic] invitation, he should be removed from work on ANET and TNET.

> . . . . .

> As previously stated, Mr. Cole can remove the conflict of interest by *rejecting Mr. Kiletta's [sic] invitation and breaking off all discussion with him* regarding employment.

Letter from Michael J. Vandamm to Rex. M. Maytan of June 2, 1992 (emphasis supplied).

6. On June 8, 1992, Mr. Maytan sent a letter to Richard Morris, the Project Manager at A.D. Little, which adopted (as the Postal Service's position) Mr. Vandamm's recommendation. That letter was no less clear as to the USPS's position regarding Mr. Cole's conflict of interest:

> I have been advised by General Counsel that there would exist a conflict of interest should Mr. Cole resume negotiations with

---

1. Later references to these Findings of Facts will be made "Facts ¶ x."

Mr. Kalitta while participating in the evaluations and negotiation of the Eagle [ANET] procurement. Mr. Cole must be removed from the project if he does not *affirmatively reject* Mr. Kalitta's invitation.

Letter from Rex M. Maytan to Richard Morris of June 8, 1992 (emphasis supplied).

7. On June 9, 1992, Mr. Morris, in a letter countersigned by Mr. Cole, responded to Mr. Maytan. Messrs. Morris and Cole, however, altered the conditions necessary for Mr. Cole to remain a consultant on the ANET procurement. Rather than affirmatively rejecting Mr. Kalitta's invitation, as Messrs. Vandamm and Maytan had required, Messrs. Morris and Cole promised only that Mr. Cole would not discuss employment with Mr. Kalitta *until after September 1992*. Letter of William G. Cole and Richard Morris to Rex M. Maytan of June 9, 1992.

8. On June 12, 1992, Mr. Maytan sent a memorandum to Jim E. Orlando, his superior, regarding the conflict. Even though he had previously determined that disavowal was required, Mr. Maytan commented that he was "inclined to keep [Mr. Cole] on board." The memo also made clear that Mr. Maytan was aware that the conflict of interest remained a problem; now, however, his concern was focused not on the legal effect but rather on the "political ramification" of the conflict. Letter of Richard Maytan to Jim E. Orlando of June 12, 1992. Mr. Orlando, who has asserted that his knowledge of the conflict is secondhand and came after the contract was awarded, later testified that Mr. Cole should have been "yanked" if a conflict existed.

9. Beginning June 16, 1992, the evaluation teams devised the sub factors and relative weightings for the solicitations. Mr. Cole was a member of the ANET technical evaluation team. The ANET technical evaluation team presented its standards and associated point values on June 23.

10. On June 21, Mr. Kalitta again contacted Mr. Cole in order to set up a personal meeting for June 23. Mr. Cole told Mr. Kalitta that he would not be available for a personal meeting or to discuss a position until August 28, 1992. According to Mr.

Cole, in testimony given at a deposition, Mr. Cole believed that Mr. Kalitta was not "too pleased" with this information.

11. Mr. Cole sent a letter to Mr. Maytan on June 22, 1992, advising him of the second contact and informing him that he had postponed discussion with Mr. Kalitta until August 28, 1992. Mr. Orlando testified that Mr. Maytan did not apprise him of this second contact nor of Mr. Cole's response.

12. On June 26, 1992, Mr. Maytan approved the weighting factors of the ANET evaluations team.

13. On July 30, 1992, Mr. Maytan wrote a Memo for the Record which confirmed that Bill Cole had been designated the team leader for one phase of the pre-award survey. Mr. Cole's responsibilities included "the maintenance review and the inspection of the aircraft offered in the proposals submitted in response to Solicitation ANET–93–01." Memorandum for the Record of Richard Maytan of July 30, 1992. Mr. Cole was actively involved in developing the standards and the scoring system and was in fact a "key player" in the award of the contract.

## III. DISCUSSION.

Based on the above findings of fact, about which the court finds there is no genuine dispute, the court holds the following:

1. There existed a conflict of interest on the part of William G. Cole due to his contacts with Conrad Kalitta;

2. The Postal Service, through contracting officer Rex. M. Maytan and Assistant General Counsel Michael J. Vandamm, were aware of the conflict of interest and, through Mr. Maytan, directed that Mr. Cole take appropriate measures to remedy the conflict;

3. Mr. Cole did not take the steps necessary to cure the conflict, and no rational explanation has been given as to why the USPS did not follow its own policy and remove Mr. Cole from his position;

4. The Postal Service's failure was arbitrary and capricious action which requires this court to overturn the award of contract to Postal Air on September 16, 1992;

5. Summary judgment on plaintiffs' motions for a permanent injunction is appropriate; and

6. The conflict tainted the entire procurement process after the date of initial contact, May 26, 1992, and thus all steps taken on the procurement after that date on which Mr. Cole worked must be redone.

This portion of the opinion will first analyze the appropriate standards for a reviewing court for summary judgement (III.A.), standing (III.B.), and disappointed bidder cases (III.C.). The court next details the conflict of interest (III.D.) and then addresses several of the parties' arguments which the court either does not address or finds unpersuasive (III.E.).

### A. SUMMARY JUDGMENT.

Summary judgment is appropriate when "the pleadings ... together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The record indicates that the plaintiffs have met this burden.

### B. STANDING.

■ The Postal Service argues that Express One does not have standing to seek an injunction overturning this contract award. This claim is based on the fact that the Postal Service excluded Express One from consideration at the best-and-final offer (BAFO) stage due to the Express One proposal's significantly higher cost and markedly lower scores.[2]

In this circuit, "an offeror adversely affected by the [procuring agency's] action [h]as standing to challenge the award of the contract." *Irvin Industries Canada, Ltd. v. U.S. Air Force,* 924 F.2d 1068, 1072 (D.C.Cir. 1990). The court finds, in Part III.D., below, that the procurement was tainted as of May

26, 1992, when Mr. Kalitta first contacted Mr. Cole. At that time, not only had the evaluation standards not been finalized, but the offerors had not submitted their initial offers. Thus, as of May 26, Express One was as viable a candidate for the contract as any other potential bidder. They thus are adversely affected by Mr. Cole's conflict and consequently have standing to challenge the award of the ANET contract to Postal Air on this basis.

### C. STANDARD OF REVIEW IN DISAPPOINTED BIDDER CASES.

■ In this circuit, a reviewing court may not set aside a federal agency procurement decision unless, *inter alia,* "the procurement official's decisions on matters committed primarily to his own discretion had no rational basis...." *Irvin Industries Canada, Ltd. v. U.S. Air Force,* 924 F.2d 1068, 1072 (D.C.Cir. 1990). Defendants argue that the court should be particularly hesitant to interfere with this contract due to the Postal Service's expertise in applying its own technical regulations and evaluation techniques; such areas, it is presumed, are better decided by those on the front lines of the procurement than by a reviewing court. Postal Service Motion at 4; Postal Air Motion at 37–38.

The court finds that special deference to the Postal Service's determination on the issues reached by the court is inappropriate. In this case, the composition of the evaluation team was within the personal discretion of Mr. Maytan, the contracting officer. The primary issue is whether Mr. Maytan rationally applied the simple ethical principles proscribed by the Postal Service (through the persons of Mr. Vandamm and Mr. Maytan himself); interpretations of technical regulations and complicated evaluation procedures are not implicated. Thus, as the court finds that the Postal Service's decision to retain Mr. Cole as an evaluator was irrational, the court is required to set aside the contract award to Postal Air.[3]

---

**2.** Initially, five offerors submitted proposals. One subsequently dropped out and the Postal Service excluded Express One from consideration. Thus, only Emery, Postal Air, and Ever-

green (an offeror not involved in this suit) were included in the Postal Service's final analysis.

**3.** Defendants note that the court may not overturn this contract merely because the court be-

### D. CONFLICT OF INTEREST.

#### 1. *Previous Findings: The Preliminary Injunction.*

In granting the preliminary injunction in this case, the court examined closely Mr. Cole's conflict of interest. The court first found that the Postal Service had rightly determined that Mr. Cole would have to "affirmatively reject" Mr. Kalitta's overtures in order to remain conflict-free; this Mr. Cole did not do. The court then found that the Postal Service's failure to enforce this standard was irrational and entered a preliminary injunction against the defendants.

After extensive discovery, the parties have produced only one document that materially affects the court's earlier decision: a memorandum from USPS Assistant General Counsel Michael J. Vandamm to the contracting officer, Rex Maytan, dated June 2, 1992. *See* Facts ¶ 5. That memo further confirms the court's original impressions: first, that the Postal Service clearly understood the conflict of interest at issue and how to deal with it; and second, that Mr. Maytan's failure to remove Mr. Cole after Mr. Cole failed to reject Mr. Kalitta's invitation—as required by the Postal Service—was irrational.

#### 2. *Today's Holding.*

In order to find that the contract award should be overturned, the court must find that the Postal Service's decision not to exclude Mr. Cole was irrational. That finding is premised on three conclusions: (1) that a conflict of interest existed; (2) that the Postal Service was aware of the conflict and established a procedure to alleviate that conflict; and (3) that the Postal Service failed to follow that procedure or provide a rational explanation as to why a different procedure was followed.

■ (1) The first conclusion is easily reached. While Mr. Cole was working as an evaluator on the ANET procurement, he had left open the possibility of future employment with Mr. Kalitta and AIA, an offeror for the ANET contract. Rather than "affirmatively reject[ing] Mr. Kalitta's invitation," as the Postal Service required, Mr. Cole did not contact Mr. Kalitta and reject the invitation. Nor did he reject the invitation in his letter to the Postal Service. Rather, Mr. Cole merely postponed his discussions regarding future employment. And, in his second communication with Mr. Kalitta, Mr. Cole did not affirmatively reject Mr. Kalitta's overtures; again, he only postponed discussion. This is not sufficient to remove the taint of conflict of interest.

The Supreme Court has stated that conflict of interest statutes "attempt to prevent honest government agents from succumbing to temptation by making it illegal for them to enter into relationships that are fraught with temptation." *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 550, 81 S.Ct. 294, 309, 5 L.Ed.2d 268 (citations omitted). Ethical principles regarding conflicts of interest are no different. The fact that Mr. Cole deferred interviewing until after August 28 is therefore of no moment; Mr. Cole still had an ongoing relationship with Mr. Kalitta and therefore still was subject to the influence of his potential future employer. The temptation to assist the source of future employment—here AIA—is exactly the type of conflict of interest that statutes and ethical principles are designed to prevent. And it is exactly the type of conflict of interest the government must—and should have here—prevented.

■ (2) The second conclusion is that the Postal Service was aware of the conflict and established a procedure to alleviate that conflict. This cannot be questioned. Assistant General Counsel Michael J. Vandamm stated on June 2, 1992, that:

> We would regard Mr. Cole as having a conflict of interest if, while he is employed

---

lieves the conflict of interest could have been handled in a better fashion; the court may not substitute its judgment for the contracting officer's. And, indeed, the court must find the Postal Service policy to be irrational, not just less-than-optimal, to justify re-solicitation of this contract. The court might be concerned that it was substituting its judgment but for the fact that the court's idea of a sound policy is *identical to that proscribed by the Postal Service itself,* a policy the Postal Service—inexplicably and irrationally—did not follow. It is this decision which the court deems irrational.

by, or while he is negotiating or discussing his prospective employment with Kiletta [sic], he is also a consultant for any procurement in which Kiletta [sic] is an actual *or prospective* contractor or subcontractor, or otherwise has a financial interest.

Letter of Michael J. Vandamm to Rex. M. Maytan of June 2, 1992. This perfectly described Mr. Cole's position after May 26, 1992. Later in that letter, Mr. Vandamm tells of how Mr. Cole may "remove the conflict of interest," *id.*, further confirming his awareness of the conflict's existence. Moreover, Mr. Maytan received the letter of Messrs. Morris and Cole, dated June 9, 1992, which stated that Mr. Cole had *not* affirmatively rejected Mr. Kalitta's invitation but rather had *postponed* negotiations until after August 28, 1992. After receiving this letter, Mr. Maytan knew that a problem still existed because he worried, in a letter to Mr. Orlando, his superior, that there would be political ramifications to this decision. *See* Facts ¶ 8. This conclusively demonstrates that the Postal Service was aware of both the genesis of the conflict of interest and its continued existence.

In addition, as summarized by Facts ¶¶ 5 & 6, both Messrs. Vandamm and Maytan clearly formulated a policy for handling Mr. Cole's conflict of interest. Mr. Maytan recognized that Mr. Cole's options were two: (1) "he could affirmatively reject Mr. Kalitta's invitation[;]" or (2) "he must be removed from the project." Letter of Rex M. Maytan to Richard Morris of June 8, 1992. Mr. Vandamm had reached the same conclusion a week earlier: "unless and until Mr. Cole affirmatively rejects Mr. Kiletta's [sic] invitation, he should be removed from work on ANET...." Letter of Michael J. Vandamm to Rex M. Maytan of June 2, 1992. There can be no doubt as to what the Postal Service required.

 (3) Before overturning the contract, the court must reach a third conclusion: that the Postal Service failed to follow its procedure or, in the alternative, to provide a rational explanation as to why it followed a different procedure. Although the Postal Service policy was clear, Mr. Cole did not reject Mr. Kalitta's invitation; he merely postponed discussions. And, although Mr. Maytan was aware of Mr. Cole's failure to follow the Postal Service's requirements, Mr. Maytan nonetheless chose not to remove Mr. Cole from work on ANET. This decision is irrational.

It appears. that Mr. Maytan was following the old saw, "close enough for government work." Mr. Cole took some steps to alleviate the conflict, and Mr. Maytan concluded that those steps were sufficient, even though they clearly did not meet the requirements he had included in his letter to Mr. Cole the previous day. When it comes to ethical issues such as this, however, "close enough for government work" is not sufficient. In a democratic state, the government must be held to a higher standard than "close enough." Public confidence in the integrity of the public procurement system, as well as in the public government itself, requires that those who work for the government refrain from the appearance of impropriety to the greatest extent possible. "Close enough for government work" does not meet this standard.

In short, the evil that must be avoided is the appearance of favorable treatment by an agent of government towards a private entity. The existence of a conflict of interest leads to an appearance of favorable treatment by the government employee (here, Mr. Cole) in order to receive a better job offer (here, from Mr. Kalitta). Unless the would-be employee's opportunity is terminated—either by rescission of the opportunity by the would-be employer or complete disavowal by the would-be employee—the appearance remains.

Moreover, there is no justification in the record as to why Mr. Maytan or the Postal Service did not follow the previously announced (and obviously correct) policy. In the absence of any rational justification—or any contemporaneous justification at all, for that matter—the court must conclude that it was arbitrary and capricious to abandon a prudent and legal policy in favor of one which allows a conflict of interest to continue unchecked.

As the Postal Service's discretion was implemented in an irrational fashion, the court must overturn the contract award.

### E. OTHER ARGUMENTS.

Plaintiffs and defendants make one argument, concerning the applicability of 18 U.S.C. § 208, that the court need not reach based on the holding in Part III.D. (Part III.E.1).[4] In addition, defendants raise several defenses in an effort to forestall the court's inevitable finding that a conflict of interest fatally tainted this procurement; each of these is addressed briefly below (Parts III.E.2–7).

#### 1. *18 U.S.C. § 208.*

Emery strongly urges the court to find that Mr. Cole's actions violated 18 U.S.C. § 208(a). Relying on *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961); *United States v. Conlon*, 628 F.2d 150 (D.C.Cir. 1980), *cert. denied*, 454 U.S. 1149, 102 S.Ct. 1015, 71 L.Ed.2d 304 (1982), and *United States v. Schaltenbrand*, 930 F.2d 1554 (11th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 640, 116 L.Ed.2d 658 (1991), Emery argues that the terms of § 208 should be broadly interpreted so as to include Mr. Cole's conduct in this case. A finding of conflict, they argue, requires that the contract be declared void *ab initio*. The Postal Service and Postal Air just as strenuously argue that § 208 does not apply (both because Mr. Cole was not a government employee covered by the statute and because the conduct would not rise to the level of a § 208 violation).

As the court has determined that the Postal Service acted irrationally in ignoring Mr. Cole's conflict of interest, it does not reach the issues of whether § 208 applies to this case or whether Mr. Cole committed a § 208 violation.

#### 2. *Mitigating Factors.*

■ Defendants raise several issues that, they claim, either minimize or eliminate the conflict of interest. For instance, defen-

dants assert that the conflict is alleviated (1) because Mr. Kalitta did not know that Mr. Cole was an evaluator; and (2) because Mr. Kalitta was only a *potential* offeror on the ANET procurement (since no bids had been received at the time of the contacts). Postal Service Motion at 6. Neither of these, however, is a defense. First, Mr. Kalitta's knowledge is irrelevant, as it is the irrational behavior of the *Postal Service* in not alleviating the conflict that is at issue. Second, as Mr. Vandamm noted in his June 2, 1992, letter, a conflict exists whether the offeror is actual *or potential.* Moreover, the conflict did not exist solely at the time of the two contacts, but from May 26 through the end of the procurement; by that time, Kalitta was more than a mere potential offeror.

The Postal Service also claims that the indeterminacy of the position Mr. Kalitta sought to fill minimizes or eliminates the conflict. Postal Service Motion at 6–7. Though the position did not presently exist, however, Mr. Kalitta's and Mr. Cole's expectations, not the actual present existence of the position, are the focus of a conflict inquiry. It is clear that both parties were acting in anticipation of a specific position being created (otherwise, there would have been no reason for them to talk). Based on their mutual expectations, a conflict certainly exists.

#### 3. *Public Policy.*

■ Defendants assert that even if an appearance of a conflict of interest existed, the court should find that the contracting officer acted within his reasonable discretion by awarding the contract in the best interests of the Postal Service. Citing to *Crandon v. United States,* 494 U.S. 152, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990), 48 C.F.R. § 9.5 et. seq. (1990), and an Office of Federal Procurement Policy (OFPP) Policy Letter, 54 Fed. Reg. 51805 (Dec. 18, 1989), the Postal Service argues that in the interest of "encourag[ing] participation of highly qualified persons and firms in federal procurement programs," an agency official shall "make award unless a conflict of interest is believed to exist that

---

**4.** Based on its holding in Part III.D., the court also need not—and therefore does not—address

or adjudicate the merits of the other counts in plaintiffs' complaints.

cannot be avoided or mitigated." Postal Service Motion at 15–16 (quotations and citations omitted). The court will address both parts of this argument as each is problematic.

(1) First, the interest in "encouraging participation" is not implicated in this case. In *Crandon*, for instance, the Court addressed the policy implications behind 18 U.S.C. § 209(a) as it applied to a conflict arising when an individual *first enters government service* (in that case, severance payments by the employees' former employer). The present case raises a much different issue: whether an individual who has already assumed governmental responsibility may negotiate for post-government employment. The latter situation raises the ugly spectre of several problems conflict of interest laws seek to eradicate—the serving of two masters, favoritism, succumbing to outside influences, and unwholesome appearance, *see Crandon*, 494 U.S. at 165, 110 S.Ct. at 1005—while the interest the Postal Service cites in attracting qualified individuals is rendered irrelevant (as Mr. Cole had already agreed to participate in the procurement). The Postal Service's post hoc interest in attracting qualified employees simply cannot justify allowing this conflict to persist.

(2) Moreover, according to the Postal Service, award is to be made in the face of a conflict of interest only if the conflict "*cannot be avoided or mitigated.*" 54 Fed. Reg. at 51809 (emphasis added). Here, avoidance or mitigation could be achieved as soon as the conflict arose: (1) Mr. Cole might have rejected Mr. Kalitta's overtures; or (2) Mr. Maytan might have relieved Mr. Cole of his responsibility. Neither party took either step, thus precluding a valid award of this contract.

A third shortcoming in this argument is found in the sources on which the Postal Service relies. The USPS argues that the contracting officer may award the contract— despite a conflict of interest—if the officer finds award to be in the best interest of the United States. However, the authority cited for this point also states that "the contract file should be documented to reflect the basis for that finding." Postal Service Motion at 16 (quoting 54 Fed. Reg. at 51809). Al-

though it is clear that Mr. Maytan recognized that a conflict still existed (else his concern about the "political ramifications" of retaining Mr. Cole is nonsensical), Mr. Maytan provided no contemporaneous evidence that retaining Mr. Cole was in the best interests of the Postal Service. In fact, there is no evidence in the administrative record that Mr. Maytan *ever* made such a determination. Without any evidence justifying this decision, and in light of the clear policy expressed by Mr. Maytan himself and Mr. Vandamm, the court must conclude that Mr. Maytan's decision to not follow that policy was an abuse of discretion.

### 4. *Absence of Harm.*

█ The Postal Service argues that, in the absence of a statutory violation, the court should not overturn the contract without a finding of actual harm. There can be no such finding, the Postal Service argues, since Mr. Cole's scores were "not out of line with other evaluators." Postal Service Motion at 21. The court must consider more than mere scores, however. Not only did Mr. Cole score the offerors (giving his highest score to Postal Air); he also was instrumental in developing the scoring system for the technical evaluation and was a participant at the briefings of the contracting officer and others. Given the extent and nature of his participation in the ANET procurement—all evidence indicates that he was a "key player"—his conflicted status taints the entire process. *See United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 549, 81 S.Ct. 294, 309, 5 L.Ed.2d 268 (1961); *TRW Environmental Safety Systems, Inc. v. United States*, 18 Cl.Ct. 33, 65 (1989).

The cases upon which defendants rely do not lead to a different result. Of primary importance is *Robert E. Derecktor of Rhode Island, Inc. v. United States*, 762 F.Supp. 1019 (D.R.I.1991), which defendants claim requires a showing of harm before a court overturns a contract. However, the *Derecktor* holding is limited to the facts in that case, in which the court found no evidence that an alleged conflict of interest even *could* cause prejudice to the disappointed bidder. 762 F.Supp. at 1029. Here, there is no question

that Mr. Cole's conflict attains this minimal standard.

### 5. *Innocence of Postal Air.*

■ Postal Air argues that the contract should not be overturned because (1) Postal Air was an innocent party; and (2) overturning the award would not protect the integrity of the procurement process. Plaintiffs counter by arguing that the knowledge of Mr. Christopher, Mr. Kalitta's eventual partner, must be imputed to Mr. Kalitta as both eventually are agents of the same corporate entity.

In any event, the integrity of Postal Air or of Mr. Kalitta is not the only factor to be considered. Rather, the integrity that must be maintained is not only of the offerors, the innocence of whom the court need not presently adjudicate, but also of the government itself. The entire process—both the actions of the offerors and the government—must be held up to scrutiny:

> Conflict of interest litigation is 'directed at an evil which endangers the very fabric of a democratic society, for a democracy is effective only if the people have faith in those who govern, and that faith is bound to be shattered when high officials and their appointees engage in activities which arouse suspicions of malfeasance and corruption.'

*Crandon v. United States,* 494 U.S. 152, 165 n. 20, 110 S.Ct. 997, 1005 n. 20, 108 L.Ed.2d 132 (quoting *United States v. Mississippi Valley Generating Co.,* 364 U.S. 520, 562, 81 S.Ct. 294, 315, 5 L.Ed.2d 268 (1961)). Thus, although Postal Air may possibly be an unfortunate victim, the public's interest in the integrity of the process *does* demand that the contract be overturned. *See Mississippi Valley,* 364 U.S. at 565–66, 81 S.Ct. at 317.

### 6. *41 U.S.C. § 423.*

■ Postal Air asserts that the conduct in this case comports with 41 U.S.C. § 423, the Office of Federal Procurement Policy Act, which Postal Air describes as the "strictest of government contract laws." As a result, it claims, the court should find no conflict and uphold the contract. Postal Air Motion at 34. Whether or not Mr. Cole's conduct comports with the Procurement Integrity Act is not controlling, however. At issue in this case is Mr. Maytan's unjustified and irrational change of standards: first, he determined—correctly—that Mr. Cole must "affirmatively reject" Mr. Kalitta's overtures or be removed from the procurement; later, he retained Mr. Cole even though Mr. Cole violated those instructions. It is the Postal Service's decision to retain Mr. Cole despite this violation that is questioned and that requires that this contract be overturned.

### 7. *Emery's Alleged Factual Mischaracterizations.*

Defendants assert that Emery falsely and intentionally led this court, at the preliminary injunction stage, into believing that Mr. Kalitta had made Mr. Cole a job "offer." Based on the minimal record at the time, and the limited extent of discovery the court had authorized, the court refuses to impute malice to Emery. Moreover, Emery subsequently amended its argument to reflect the facts.

However, the court is greatly disturbed that defendants, while complaining of Emery's alleged past misdeeds, themselves are clearly guilty of repeated mischaracterizations of the evidence even now, at the summary judgment stage of this litigation. Both the Postal Service and Postal Air describe the letters of Messrs. Vandamm and Maytan, dated June 2 and June 8, as merely stating that a conflict of interest *would* exist if Mr. Cole *resumed* negotiations with Mr. Kalitta. *See* Postal Air Motion at 31; Postal Service Motion at 7. Neither acknowledges, however, that *both* letters *required* Mr. Cole to *affirmatively reject* Mr. Kalitta's invitation. Such a mischaracterization can only be seen as an intentional attempt to mislead the court.

## IV. REMEDY.

■ Based on the facts and for the reasons stated above, the court determines that work on the ANET–93–01 procurement was tainted by the conflict of interest of Mr. Cole from May 26, 1992. The only remedy, therefore, is to redo the part of the solicitation and evaluation in which Mr. Cole participated

after that date. Thus, the United States Postal Service shall resolicit the ANET–93–01 contract. All portions of the contract on which William G. Cole worked after May 26, 1992, including the design of the scoring system for the technical evaluations and the grading of the offerors' initial proposals, must be redone. And, since the conflict arose before the offerors submitted their initial proposals (and all offerors were therefore affected by the taint), both plaintiffs shall be permitted to submit initial proposals and best-and-final offers (BAFOs).

A separate order shall issue this date.

## ORDER AND FINAL JUDGMENT

This case comes before the court on all four parties' motions for summary judgment. Upon consideration of the arguments of counsel, and for the reasons set forth in the accompanying Memorandum Opinion, it is hereby ORDERED that:

1. The ANET–93–01 contract, awarded by the United States Postal Service to Kitty Hawk Air Cargo, Inc., on September 16, 1992, shall be and is declared illegal and void.

2. The United States Postal Service, its officers, agents, and employees, and all other persons in active concert or participation with them, are permanently enjoined from authorizing or performing any work under the contract awarded on September 16, 1992, pursuant to solicitation ANET–93–01; and from incurring additional obligations and authorizing expenditures by any contractor of funds for performance of the work on the ANET contract.

3. The United States Postal Service shall re-solicit all portions of the contract on which William G. Cole worked after May 26, 1992, including the design of the scoring system for the technical evaluations and the grading of the offerors' initial proposals. Plaintiffs shall be permitted to submit initial proposals and best-and-final offers (BAFOs).

1. USPS has moved under Fed.R.Civ.P. 60(b); Postal Air has moved under Rule 59(e).

2. The court found that USPS and Postal Air mischaracterized the evidence in the record by selectively emphasizing only one portion of two

4. Defendants need not seek a stay from this court of this permanent injunction before seeking appellate relief as such a stay will not be granted. Leave to seek an immediate stay from the Court of Appeals pending appellate review of this decision is therefore appropriate.

5. Emery and Express One's motions for summary judgment and their motions for a permanent injunction are GRANTED to the extent set forth herein and in the accompanying memorandum opinion. The summary judgment motions of Postal Air and the United States Postal Service are DENIED. Final judgment is hereby entered for plaintiffs Emery and Express One.

SO ORDERED.

## MEMORANDUM OPINION AND ORDER

On December 22, 1992, the court granted plaintiffs' motions for summary judgment and declared "illegal and void" the ANET–93–01 contract, awarded by the United States Postal Service (USPS) to Kitty Hawk Air Cargo, Inc. (now known as Postal Air) on September 16, 1992. Both defendants now have moved the court to modify its memorandum opinion;[1] Postal Air has also moved the court to alter its judgment in several other respects under Rule 59(e). In addition, Emery has submitted a bill of costs under Rule 54(d), 28 U.S.C. §§ 1920 and 1821, and Local Rule 214(d).

I. *Modification of the Memorandum Opinion.*

A. Mischaracterizing the Evidence.

In the first complete paragraph on page 23 of its Memorandum Opinion, the court expressed concern that Postal Air and USPS were accusing Emery of mischaracterizing evidence. The court then gave an example of how the briefs submitted by both Postal Air and USPS contained mischaracterizations comparable to the alleged misdeeds of Emery.[2] Both defendants now move the court

letters written by USPS officials. As a result of this emphasis, the true import of the letters was not made completely clear to the court on the cited pages.

to delete this paragraph and thereby remove the court's expression of concern.

Both Postal Air and USPS argue that, in the pages cited by the court, each was emphasizing a specific aspect of the record, not attempting to misdirect the court. Each also defends its practice by claiming to have given a more thorough reading of the two letters elsewhere in their briefs.

The court acknowledges that defendants' briefs, in their entirety, do give a more complete description of the letters. The court still believes that the cited passages are deficient in that they lack complete candor: in these pages, defendants emphasized only a limited portion of the letters, neglecting to note that the clear implication of the letters was contrary to the passages they cited. However, defendants did address the rest of the letter elsewhere, and this mitigates the offense; the court will therefore strike the first paragraph of page 23 of its memorandum opinion.

However, this litigation has been hard-fought, and all parties have taken a no-holds-barred approach to the evidence, the opposing parties, and the briefs. All parties have accused the others of improper conduct, and it appears that mistakes and errors in judgment have been made by all. The questioned paragraph in the opinion served to prevent any party from claiming the moral high ground in this case; even though that paragraph is now removed, the court's opinion remains that no party has a right to stake out that territory.

Therefore, defendants' motions are GRANTED, and the first paragraph on page 23 of the court's December 22, 1992, Memorandum Opinion is hereby STRICKEN.

### B. Postal Air's Remaining Motions.

Postal Air has also moved the court under rule 59(e) to alter its judgment in three respects. One is moot,[3] one is granted, and one is granted in part.

[3]. Postal Air moved the court to clarify its order by making more specific the procedures USPS must pursue in the re-solicitation of the ANET

### 1. Postal Air's Opportunity to Participate.

The court's order, in ¶ 3., states that "[p]laintiffs shall be permitted to submit initial proposals and best-and-final offers (BAFOs)." Postal Air moves that the court clarify the order by altering this paragraph, thus ensuring that all offerors, including Postal Air, be afforded the same rights in the re-solicitation.

Postal Air's position reflects the court's intention in the December 22, 1992, order, and its motion is therefore GRANTED. Therefore, the last sentence of ¶ 3. shall be modified to read: "Plaintiffs Emery and Express One and Defendant Postal Air shall be permitted to submit initial proposals and best-and-final offers (BAFOs)."

### 2. Declaring the ANET Contract "Illegal and Void."

Postal Air also moves the court to strike out the first paragraph of its order in which the court declared the ANET contract to be "illegal and void;" rather, it would have the court determine that a valid contract existed until the government terminated it "for convenience." Emery and USPS have both opposed the motion.

Postal Air's motion asserts that this modification will not disturb the court's intent in that the contract must be re-bid and re-evaluated in either case. The advantage of the latter holding is solely to Postal Air: if the contract is "terminated for convenience" and not "void," Postal Air will be able to recoup from USPS all moneys it expended in performance of the contract.

Emery and USPS oppose the motion for separate reasons. Both look to the public policy inherent in the overturning of contracts in which there is a conflict of interest. In addition, Emery emphasizes that Postal Air had complete knowledge of the conflict during the procurement and thus cannot claim to be an innocent party. For its part, USPS argues that Postal Air cannot use this method to seek recoupment of its expenditures when Postal Air has failed to take

contract. After USPS opposed Postal Air's motion, Postal Air withdrew it. The question is therefore moot.

advantage of available administrative remedies.

Public policy alone is a sufficient justification to refrain from completely accepting Postal Air's position. The leading—and most appropriate—case is *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961). There, the Supreme Court expounded at length on the importance of maintaining integrity and accountability in the procurement process. The conflict of interest here is one which cannot be tolerated by the government, the public, or the court. Thus, all actions taken after the conflict arose are tainted; this includes the contract.

The innocence or fault of Postal Air has not been determined by this court as it was not necessary for granting summary judgment. Emery argues that Postal Air's motion places Postal Air's conduct in inquiry, and therefore urges the court to find that Postal Air both knew about the conflict and stands guilty of allowing the conflict to persist. Again, such a finding is unnecessary.

As USPS notes, Postal Air has not pursued its available administrative remedies to determine whether it will be able to recoup its start-up expenses. When it seeks them from USPS, USPS will have the opportunity to either grant them or deny them. If USPS denies them, Postal Air will have the opportunity to seek judicial review, apparently in the Court of Claims.

However, the court's finding the contract to be illegal and void prejudges and precludes any such claim by Postal Air before it even begins. If the contract is void, Postal Air, regardless of guilt, will be unable to recover on anything but a quantum meruit standard. And, as the government has yet to receive any benefits, quantum meruit apparently equals zero recovery for Postal Air.

Therefore, Postal Air's motion is GRANTED in part; the court will modify ¶ 1. of its order as follows: The words "declared illegal and void" are replaced with "set aside." [4]

## II. *Emery's Statement of Costs.*

The court is in receipt of objections filed by Postal Air and USPS to Emery's bill of costs as well as Emery's reply in support of its costs. As the clerk has not yet taxed defendants, these briefs are premature and are stricken from the record. After the clerk has taxed costs, defendants may object or move to retax under Local Rule 214.

## III. *Other Motions.*

These seven motions are also before the court and are disposed of as follows:

- Emery's Motion for Leave to Respond, filed January 29, 1993, is GRANTED;
- Emery's Motion for Leave to Respond, filed February 4, 1993, is GRANTED;
- USPS's Motion for Enlargement of Time, filed January 19, 1993, is GRANTED nunc pro tunc;
- USPS's Motion for Enlargement of Time, filed January 22, 1993, is GRANTED nunc pro tunc;
- USPS's Motion for Enlargement of Time, filed January 25, 1993, is DENIED as moot;
- Postal Air's Motion for Enlargement of Time, filed January 25, 1993, is DENIED as moot; and
- Emery's Motion for Enlargement of Time, filed February 11, 1993, is DENIED as moot.

4. Sound reason mandates this decision. If an innocent contractor is faced with a contract that is potentially—but not clearly—invalid because of a conflict of interest, the contractor has two options: (1) breach the contract and hope that the contract is held invalid; or (2) perform and hope that the contract is held valid. The court has already mentioned the public interest in ensuring that contracts are not tainted by conflicts of interest; however, it likewise cannot leave all innocent contractors in doubt as to whether the government will later be able to repudiate the contract because of some illegality for which the contractor is not responsible. By setting aside this contract, rather than holding it "void," the court ensures that truly innocent contractors will not face this Hobson's choice: they will be able to perform their contracts and still recover their costs if the contract is later invalidated. Whether Postal Air qualifies as an innocent contractor is for another court and another day; based on this finding, that court will also be able to determine whether this contract is "void" or "terminated for the convenience of the government."

### IV. *Conclusion.*

For the reasons stated above, USPS's motion to modify the court's memorandum opinion is GRANTED. Postal Air's motion to alter judgment is GRANTED in part as explicated above.

SO ORDERED.